# Puckett v. Commonwealth.

(Decided September 26, 1930.)

GARDNER K. BYERS and H. H. MOORE for appellant.

J. W. CAMMACK, Attorney General, and GEO. H. MITCHELL, Assistant Attorney General, for appellee.

OPINION OF THE COURT BY COMMISSIONER HOBSON—
Affirming.

Brooks Puckett was indicted for the murder of William Goff in the Clark circuit court. On the hearing of the case he was found guilty of voluntary manslaughter and his punishment was fixed at twenty-one years' imprisonment. He appeals.

The first question made on the appeal is that the verdict is palpably against the evidence and should be set aside. The facts are these: Goff was running a store at Indian Fields in Clark county, in which lunches were

served and soft drinks also were sold. Puckett was a farmer who lived a mile and a half away. He was thirty-two years old and Goff was a year or so younger. They had been reared in the neighborhood and had been friends until about three months before the homicide, which occurred on Friday, June 7, 1929. About the 1st of April, 1929, Puckett with three friends came to Indian Fields in his car. After they got out of the car, a negro named Gay Gatewood came down the road by them. One of the men with Goff reach out and caught him by his watch chain. The negro jumped back and jerked out his pistol. Puckett caught the pistol and took it away from the negro. Soon after this, as they were going into Goff's store, two men assaulted him and took the pistol away from him. He went into the store and asked Goff why that bunch had treated him in that way. Goff said with an oath: "You had no business taking that gun away from my negro." Puckett replied: "If that is the way you feel about it I will turn the whole dam bunch up." Goff said with an oath: "If you do I will kill you." Puckett turned and walked out. The next morning he went to Winchester and gave information to the prohibition officers that Goff was operating a still. As a result the still was broken up. Bad feeling followed between him and Goff. He proved that on several occasions Goff said things like this: "He had my still caught and is now trying to have me caught and I don't want him around here and if he does I am going to kill him." He had information of these threats and did not speak to Goff or go in his store, and according to the proof for the commonwealth he was making similar threats as to what he would do. On the afternoon of June 7, he came down to Indian Fields with some friends in a car, bringing his shotgun with him. They stopped at the blacksmith shop near Goff's store, and Puckett was standing around there for some time with his gun in his hand or sitting in the car with his gun on his lap. Mike Wills, a witness for the commonwealth, got in the car with him and asked him to give him a drink out of his bottle. He said he had none there, but he had a bottle up the road, and if he would go up there with him he would give him a drink. They got in the car and went out the road to the place. He got out and turned a plank over and then said, "Somebody has got it." They then came back by Puckett's house, and Wills told him to take that old shotgun to the house and stick it under the bed and for him to get in the

342

bed and go to sleep. He declined to do this and went on back to Indian Fields. At another time in the afternoon he and two friends went out in the car to a farm where squirrels were said to abound, but they did not stay very long and came back to Indian Fields again, where he sat in the car with the gun on his lap until the party went out to an antique shop. They stayed there a little while and came back about 7 o'clock or a little after. The other men in the car got out and went into Goff's store to get a lunch. Puckett sat in the car near the store with his gun on his lap. While he was sitting there, Mrs. Goff came out of the store to call her kittens in off the road and feed them. While she was calling the kittens in the usual way, he said to her with an oath, "Don't you talk to me that way." She said, "I thank you, I was not talking to you." He then cursed her and used insulting language. She went back in the store and told her husband what he had said to her. Goff then got a gun that was in the store and went out with it to the car, which was just in front of the store and near it. Gay Gatewood, who was the only witness for the commonwealth as to what followed, says this : "Puckett had the gun lying across his lap. Goff walked out facing the car with a gun in his hand. He turned toward the store and asked Puckett to leave, saying 'Brooks don't come around the store here cursing and saying everything around my wife.' Goff then turned like he was starting to the store and as he turned Puckett shot him in the chest." The shot ranged downward and toward the spine. Gatewood says that Puckett shot at him but missed him as he ran. Goff was killed instantly and fell in the road dead.

On the other hand, Puckett testified that when Goff came out with the gun and came up to him, he raised the run to shoot at him, and when he did this he shot Goff with the gun on his lap without raising it, and his version of what occurred was sustained by Robert Kimball, who makes this statement:

"I noticed Will Goff and Gay Gatewood standing on the steps of this porch: Gay Gatewood pointed over to the machine and said 'there is the damn son of a bitch in that machine' and Bill Goff rushed over to the machine and said 'what in the hell you doing here?' and steps back a step or two and pulled his gun to his shoulder and said 'God damn you I am going to kill you.'"

Clay Combs, who was present at the time, corroborates the testimony of Mrs. Goff as to what took place between her and Puckett. He says that Cecil Puckett, a brother of appellant, came up in his car and offered to take appellant home, and appellant said: "I have got a plenty of G. D. shells, I don't have to go." He then said, "Where is Bill Goff? Cecil said, "I don't know," and appellant said, "the G. D. S. B. is afraid to come out." The witness went in the store a few minutes and came out and started down the road. Appellant was cursing and the witness turned around and looked. He adds, "Brooks then threw his hand that way and said 'Get the G. D. hell down the road,' and then he shot." This was just after Mrs. Goff went in and before Goff came out of the store. Three empty shells were found in the car.

The court has often laid down this rule:

"This court will not disturb the verdict of a properly instructed jury unless it is flagrantly and palpably against the evidence. The jury are the judges of the credibility of witnesses, and unless a verdict is so flagrantly against the evidence as to shock the conscience and lead unerringly to the conclusion that it was the result, not of deliberation, but of passion and prejudice, it must stand. Kirk v. Commonwealth, 192 Ky. 460, 233 S. W. 1060; Wells & Isaacs v. Commonwealth, 195 Ky. 740, 243 S. W. 1015." Branham v. Commonwealth, 223 Ky. 233, 3 S. W. (2d) 629, 630. To same effect see Mattingly v. Commonwealth, 199 Ky. 727, 251 S. W. 953; and Picklesimer v. Commonwealth, 224 Ky. 381, 6 S. W. (2d) 457.

While there was testimony impeaching the character of Gatewood, there was like testimony as to several of other witnesses, and it was within the province of the jury to determine what weight should be given their testimony.

The jury had the right to take into consideration all the facts shown in determining whether appellant shot Goff in his necessary self-defense. It did not appear that he had any business at Indian Fields. He refused more than one invitation to go home. His declarations no less than his conduct indicated that he was drinking. He shot down the road after he said Goff was a coward and afraid to come out. This was apparently to bring

him out. He admits shooting at the negro Gatewood immediately after shooting Goff, and says Gatewood had a gun drawn on him; but the impression of the shot on an object they hit indicates that he fired on the negro as he fled, and there is nothing else than his testimony to show that the negro had a gun. Under all the proof the court cannot say that the jury were not warranted in concluding from all the facts that he shot at Goff for the same reason he shot at the negro and shot down the road, and that he was there in front of the store with a loaded gun refusing to go home for the purpose of settling things just as they were settled.

Appellant when testifying in chief told all about the trouble with the negro over the pistol and his going to the prohibition officers and telling them about the still and Goff's subsequent threats against him. On cross-examination the commonwealth attorney asked him how he knew there was a still up there; how often he had been there; how he came to go there; and whether he had got liquor there. Objections were made to this course of investigation, and the court overruled the objections on this ground, as shown in the bill of exceptions:

"The defendant has stated this trouble started over this distilling proposition, and I think you are entitled to know everything so far as the two men were concerned, any association they had in connection with it."

As appellant had brought this matter in the case himself he cannot complain that on cross-examination he was asked how he knew anything about it and what basis he had for his course. These matters went to his credibility.

James Swope, a witness for the commonwealth, when introduced was allowed to testify that about five weeks before the homicide, appellant and a man named Pope, who were in the car with him, were talking about some trouble they had at the corner, and that in this conversation he said he was not going home yet, he was going on back down to the corner and clean up some negroes. He also testified that about three weeks before the homicide appellant said to him that they had put a dirty deal over on him and that Goff was behind it, and he was going to get even with Goff. The court, before the trial was concluded, excluded the statement of the witness as to what occurred five weeks before the homicide, as Goff

was not mentioned in that conversation, but admitted what he said in the last conversation as competent evidence, as Goff was expressly mentioned in the last conversation and it was a direct threat made against him only three weeks before the homicide. This was properly admitted. The testimony as to what he said about cleaning up the corner about five weeks before was excluded, and we must assume that the jury obeyed the admonition of the court.

It is earnestly insisted that there was misconduct on the part of the commonwealth attorney, and for this a new trial should be granted. But the language attributed to the commonwealth attorney in the brief is not contained in the record. The rule is well settled that an alleged improper argument by the commonwealth attorney, if not set out in the bill of exceptions, cannot be considered here. Cooley v. Commonwealth, 185 Ky. 142, 214 S. W. 898; Munday v. Commonwealth, 211 Ky. 86, 276 S. W. 1089, and cases cited. If the bill of exceptions as signed by the judge does not contain the truth as to what occurred at the trial, the defendant's remedy, under section 337 of the Civil Code of Practice, is to file a bystander's bill. See section 282, Criminal Code of Practice. When this is not done, nothing can be considered here except the bill of exceptions as certified by the circuit court. The bill of exceptions, after setting out what the commonwealth attorney said, contains these two statements:

"The defendant, by counsel, objected at the time of the making of the above mentioned statements by the commonwealth attorney, in his closing argument, and moved the court to set aside the swearing of the jury, and continue the case, but the court overruled said motion, to which ruling of the court defendant by counsel excepted at the time and still excepts.

"The court sustained every objection to statements in argument and excluded the statements objected to from the consideration of the jury with the usual admonition and admonished counsel."

When the court sustained appellant's objection to the argument of the commonwealth attorney and excluded the statements from the consideration of the jury, with the usual admonition, he had done all that was within his power. This court must assume that the jury did its duty and did not consider the things that the circuit court

excluded from their consideration. In addition to this, the excluded statements of the commonwealth attorney were not of such a nature as to require the court to set aside the jury and grant a new trial.

Lastly, it is insisted that a new trial should be granted because one of the jury had expressed the opinion that appellant should be hung before he was summoned on the jury. But the juror denied having made this statement. The matter was heard before the circuit court orally, and on all the testimony as then heard, the circuit court properly held that the juror was not disqualified.

The above are the only grounds relied on for reversal. The instructions to the jury are admirably clear and are not complained of. On the whole case and a consideration of all the facts and circumstances, the court reaches the conclusion that there was no error on the trial to the prejudice of appellant's rights.

Judgment affirmed.