# Farmers' National Bank of Somerset v. Tartar et al.

(Decided Oct. 30, 1934.)

W. O. HAYS and W. B. MORROW for appellant.
W. N. FLIPPIN for appellees.

OPINION OF THE COURT BY JUDGE CLAY—Affirming.

The Farmers' National Bank of Somerset brought this suit against V. O. Tartar, J. E. Girdler, Mrs. Lula Girdler, and R. N. Longsworth to recover on a note for $4,948.01. Tartar made no defense, and the other defendants defended on the ground that the note was executed in consideration of an agreement and promise on the part of the Bank not to prosecute Tartar for embezzlement. The jury returned a verdict in their favor, and the bank appeals.

The record discloses the following situation: Tartar was in the employ of the bank as individual bookkeeper. The shortage in his accounts was discovered by a national bank examiner, and admitted by Tartar. Tartar then began steps to reimburse the bank. A note for $3,769.51 was written by George Orwin, cashier of the bank. A conference was called at the home of Mrs.

Lula Girdler, and attended by Tartar and the other appellees. According to appellees, a note for $3,769.51 was presented to them, and they refused to sign it. A shortage of $3,769.51 had first been reported, but in their discussions with Tartar it developed that the shortage amounted to $4,948.01. During the conference the cashier was called either by Mrs. Girdler, or by the wife of Ralph Longsworth, or by Tartar, who came, bringing with him the note for $4,948.01. After the cashier's arrival, there was some discussion, and appellees all state that the cashier said that the matter had to be fixed up at once. According to J. E. Girdler, the cashier, after explaining that Tartar had been guilty of embezzlement, said that, if they would sign the note, that would settle everything, and the bank would not prosecute. According to Mrs. Girdler, the cashier told them that Tartar and two others had embezzled money, and the other two had made theirs good, and, if they did not do this today, Tartar would be prosecuted and sent to the penitentiary. Ralph Longsworth testified in substance that the cashier said that the matter had to be fixed up, and that, if they would fix it up by signing the note, the bank would not prosecute. According to Tartar himself, the conference lasted for about an hour before the note was signed, and the cashier said that, if they would sign it, there would be no prosecution, and it would keep him from having to serve a term in the penitentiary. On the other hand, Mr. Orwin, the cashier, testified that he made no promise nor agreement to any of appellees that, if they would sign the note, Tartar would not be prosecuted, nor did he make any threats that, if Tartar did not make good, the bank was going to send him to the penitentiary. He further testified that it was not necessary for the bank to get the note or take any note in order to collect the shortage, but that Vestal Tartar and his sureties had requested him to apply to the directors for a loan. At that time Tartar had turned over to the bank collateral worth over $1,000. The bank was also secured by a bond for $4,000. There was no reason why the bank should attempt to try to induce any one to make the shortage good. The original note for $3,769.51 was drawn by him at Tartar's request, and the suggestion came from Tartar.

It further appears that shortly after the execution of the note the officers of the bank issued a public statement, which was published in a local newspaper on July

4, 1930, and which disclosed the peculations by Tartar, and that thereafter Tartar was indicted in the federal court and convicted of charges growing out of the revelations. It also appears that the interest on the note was promptly paid up to January 1, 1933, but that the interest so paid was money belonging to Tartar, and that appellees frequently stated that they would pay the note, and never made any claim that it was signed in consideration of the bank's promise not to prosecute.

Appellant takes the position that the evidence was not sufficient to show an agreement on its part to compound a felony; and that, even if the conversations be interpreted and construed as an agreement not to prosecute the defaulting bookkeeper, still, at the time they are alleged to have been had, appellant was fully protected and indemnified by a solvent bond, its interests were not jeopardized by the delinquencies of the principal maker of the note, and their attitude toward him was one of philanthropy and commiseration, for which reasons the agreement was not illegal.

In support of this position, the argument is that Tartar was indebted to the bank, and the bank had the right to accept a note for his shortage; that no officer of the bank approached appellees on the subject of signing the note, but that the note was prepared solely at the suggestion of Tartar; that the cashier did not appear at the conference until there arose a dispute as to the amount of the shortage, and he was then called by some one present; that no prosecution was pending, and there had been no threats of prosecution; that shortly after the conference the facts were published in the paper, and thereafter Tartar was prosecuted and convicted in the federal court; that, after his conviction, interest was paid on the note, and appellees never claimed that the consideration for the note was a promise on the part of the bank not to prosecute until suit was brought on the note. That the argument thus strongly pressed is very persuasive cannot be doubted, but there are other circumstances that cannot be overlooked. Appellees are friends and distant relatives of Tartar. They were not interested merely in discharging his obligation to the bank. That he was short in his accounts was already well known. They were chiefly interested in seeing that he was not prosecuted and confined in the penitentiary. Of course, if they signed the note in the mere hope that,

if the shortage was made good, he would not be prosecuted, an entirely different situation would be presented. However, the case does not end there. They all testify that the cashier said to them that the matter had to be fixed up, and that, if they signed the note, that would end the matter and there would be no prosecution, and that they would not have signed the note had it not been for that promise. It is true that shortly after the execution of the note there was a prosecution, but it does not appear that the prosecution was instigated by the bank. While the cashier's statement that no promise was made finds support in the circumstances leading up to and subsequent to the execution of the note, yet, in view of the positive statement of appellees that there was a promise not to prosecute, coupled with the fact that their interest went further than the mere payment of the shortage, it cannot be said that the evidence of the promise or agreement was not sufficient to take the case to the jury, or to sustain the verdict.

But the further point is made that the bank was entitled to a peremptory instruction on the ground that, even if there was an agreement not to prosecute, it did not amount to the compounding of a felony, because the note was taken merely from motives of kindness and compassion, and not for the sake of gain. In support of this position appellant relies upon the case of Ward v. Allen, 2 Metc. (Mass.) 53, 35 Am. Dec. 387. The facts in that case were that, after a draft had been delivered to the plaintiff for security, there was a promise not to expose the drawer's alteration of a prior draft. After adverting to the fact that the promise was not made until after the transaction, and holding that the promise of secrecy, whether right or wrong, legal or illegal, formed no part of the consideration of the contract in pursuance of which the draft on the defendant was given, the court added the following:

> "But if the promise had been made before the draft was given, it would not vitiate the contract. To render such a promise illegal, so as to vitiate a contract, it must appear to have been made for the sake of gain, and not merely from motives of kindness and compassion."

In support of this position, the court referred to 16 Mass. 93, 94, wherein is reported the case of Commonwealth v. Pease. There the accused had taken from the

felon a promissory note upon agreement not to prosecute. In discussing the question, the court said:

"The objection is, that the facts alleged and proved do not constitute the offense anciently called Theft bote, now more commonly compounding a felony; and the definition of the offense by Sergeant Hawkins, and other writers on the criminal law, has been resorted to in support of the objection. What is that definition? Judge Blackstone, in the place referred to, says, 'Theft bote is where the party robbed not only knows the felon, but also takes his goods again, or other amends, upon agreement not to prosecute.' Now the question is, whether a promissory note of hand will satisfy the terms other amends.

"It is argued that it will not, because such a note will be void in law, and in fact nothing may ever be received.—But there seems to be no reason for this nice and critical construction of the words. The note, although voidable, is in fact of value to the holder, until it is avoided. It may never be disputed. Indeed it would be hazardous ever to dispute it; for the promisee would then be released from his engagement not to prosecute; so that he holds a coercive power over the maker of the note, as strong as the law.

"But further, what is the gist of the offense? It is the concealing of the crime, and abstaining from prosecution, to the detriment of the publick. Now if a man is induced to this by the promise of money, and actually takes an obligation for the money, every thing necessary to constitute him criminal in the eye of the law seems to be done. * * *

"But here the amends are only an incident to the crime, which consists principally in smothering a prosecution, and screening an offender from justice. All that the law requires is, that it should appear to be for the sake of gain, and not merely from weak or compassionate motives, and this probably is the reason why it is necessary to allege that any thing has been received, by way of inducement to the commission of the offense."

It will be observed that the court held that the ac-

ceptance of a promissory note for the goods taken was for the sake of gain, and not merely from weak or compassionate motives. But the argument here is that the note in question was not taken for the sake of gain, as appellant was otherwise secured. The surety bond for $4,000 is not before us, and its terms are not given. For aught that appears, liability may have been predicated upon certain conditions that were not complied with, and there may have been doubt of the bank's right to recover. The amount of the shortage was fixed in the note, and this sum the makers agreed to pay, and we are not inclined to the view that a mere showing that the bank had other security to which it might resort was sufficient to deprive the transaction of the element of gain, even if that element be necessary, a question which we do not feel called on to decide. It follows that appellant was not entitled to a peremptory instruction.

Another contention is that the court erred in excusing juror Josh Dick, and calling a bystander to fill his place. It appears that the juror had on deposit in appellant bank about $25, and that his infant son had a savings account of not less than $15, and it is argued that the interest of the juror was too small to justify his rejection. Jurors should be disinterested and free from bias. What will not affect one juror may affect another, and bias may not always be measured by the extent of his interest. The juror was a depositor, and therefore interested in the solvency of the bank. The loss of the suit might have jeopardized his interest. In ruling upon challenges for cause, the trial court has a wide discretion, and, in the circumstances here presented, it cannot be said that that discretion was abused. Wilder v. Louisville R. Co., 157 Ky. 17, 162 S. W. 557.

Lastly, it is insisted that the instruction was erroneous. The instruction authorized a finding for defendants if the jury believed from the evidence that they were induced to sign the note sued on by the statements and representations of the cashier that, if they signed same as sureties of Tartar, the said Tartar would not be criminally prosecuted, and it is argued that, in view of the answer, the court should have submitted the issue whether the alleged agreement not to prosecute was the only consideration that induced defendants to sign the note. We do not regard the instruction as defective in the respect claimed. If the note was executed upon the

faith of the promise not to prosecute, the note was invalid, and it is wholly immaterial that there were other considerations, such as kinship and friendship.

Judgment affirmed.