## TARRENCE v. COMMONWEALTH.

Court of Appeals of Kentucky.

Dec. 18, 1953.

Rehearing Denied March 19, 1954.

See also 265 S.W.2d 52.

42

Sandy Paniello, Louisville, for appellant.

J. D. Buckman, Atty. Gen., H. D. Reed, Jr., Asst. Atty. Gen., for appellee.

STANLEY, Commissioner.

The appellant, Roy Tarrence, and his son, Leonard Tarrence, upon separate trials were convicted of the murder of Francis J. McCormick and sentenced to death. We first consider the appeal of the father. There is no question of guilt but there are many questions as to the fairness and legality of the trial. Our summary disposition of some of them is in the interest of reasonable brevity and should not be regarded as indicating summary consideration for every question has been given full consideration.

To avoid prosecution for seduction, Leonard Tarrence had married the girl involved and she had obtained an order of court requiring him to pay her $7.50 a week for the support of their child. Tarrence had then joined the army, but in a short while had become absent without leave. Leonard's wife brought him before the court for failure to maintain his child and it seemed that he was about to be returned to the army. Francis J. McCormick, an attorney, represented the girl in all these proceedings. The Commonwealth presented evidence that the father and the son had become angered at the lawyer, and upon two occa-

sions the father, Roy Tarrence, had expressed his animosity in terms which proved to be prophetic. He had said that before he would let the lawyer and the girl send his son overseas to get killed, "I'll take a club and beat his [the lawyer's] brains out." Later at the home of a friend on Harrods Creek he said, "that someone should knock him in the head and throw him in the creek." He denied any ill-will and the threats.

In the late afternoon of February 28, 1952, while McCormick was walking home through an alley between Fourth Street and Garvin Place near Oak Street carrying groceries, which was according to his custom, the Tarrences pulled up beside him in the father's automobile. Both men got out and apparently without warning or immediate provocation began beating McCormick. They forced him into the car and drove away. This is the evidence for the Commonwealth adduced by several eyewitnesses. One of them noted the license number of the car and this soon led the officers to the Tarrence home.

The Commonwealth deduces from certain evidence that the assault and abduction, if not the murder, had been previously deliberately planned.

The defendant and his son testified they had been working on their automobile at their home near Jeffersontown, southeast of Louisville, during the day and that afternoon went to a junk yard in the city west of the point of assault to obtain a certain article. This was corroborated by the dealer. They testified that on their way home they happened to see Mr. McCormick at the grocery. Leonard walked with him into the alley a short distance to talk with him amicably about getting his trouble settled, when, according to Leonard, McCormick replied that he was going to send him to the penitentiary or back to the army; then Leonard hit him with his fist and in the resistance picked up a stick and struck him. Both the father and son testified that the father did not get out of the car until the affray had started and then he undertook to separate the men. McCormick became un-conscious. The Tarrences became frantic and put him in the car and drove around the city for awhile until they could determine what to do. Their testimony is that McCormick died in the car. But when Leonard surrendered to Judge Mix, one of the judges of the criminal branch of the court, a few days later, he told him that he and his father had both assaulted McCormick and that he was killed at the creek while conscious. Their formal confession will be stated in the opinion in Leonard Tarrence's case.

We pass for the moment the intervening developments.

The men took McCormick 12 or 13 miles away to a rather remote place on Harrods Creek; weighted his body and dropped it in a deep hole in the creek.

■ *Demurrer to the indictment.* The appellant's attorney recognizes that a demurrer reaches only a defect appearing on the face of an indictment. The indictment was returned March 12, 1952. The appellant points out that under the law the grand jury had been convened on the first Monday in that month, which was March 3, hence, he argues, it must follow that the grand jury had been in session nine days without an order of court extending the period beyond six days as stipulated in the statute. KRS 29.240; see Harrod v. Commonwealth, Ky., 253 S.W.2d 574. The argument is that considering the date of the indictment with judicial knowledge of the calendar, the defect appears on the face of the indictment and the demurrer to it should have been sustained. If we should accept the premise of the argument, the conclusion of invalidity would not follow. Unlike the records in the Harrod habeas corpus proceeding, this record does not show that the grand jury had been in session continuously every day during the first week after being impaneled nor that there was no order extending the period. Regularity in the proceeding is to be presumed. Sizemore v. Commonwealth, Ky., 262 S.W.2d 817 is directly in point. We find no merit in this contention.

*Change of venue.* Before a severance of trial was ordered, the defendants jointly petitioned for a change of venue. There had been a great deal of newspaper and radio publicity concerning the abduction and homicide and the events of the following two or three weeks. A number of affidavits stated that public opinion was hostile to the defendants and a number filed by the Commonwealth controverted this and expressed the view that the accused men could obtain a fair and impartial trial in Jefferson County. Several of the affiants who had served on juries in the past related their observations and experiences, among which were that many jurors do not read the newspaper accounts or have any knowledge of sensational crimes, several of which were mentioned. An extended oral hearing was had on the motion and many representative witnesses testified in support of the respective contentions. It was shown that the Louisville newspapers and radio newscasts have wide circulation in the adjoining counties and far beyond. The trial court filed an opinion justifying his order overruling the motion for a change of venue and in it stated that if upon examination of the 150 veniremen summoned for the trial it should appear that the defendants could not receive a fair trial he would give further consideration to the motion. In the examination of these veniremen no prejudice or antagonism was developed nor was any unfair influence traceable to the publicity. Many were excused because of conscientious scruples against the death penalty. The defendants did not renew their motion during the course of selecting the jury.

We have carefully considered the voluminous evidence on the motion. It is not shown there was denunciation of the accused or any expressions in the newspapers or on the radio of a prejudicial or inflamatory nature that might tend to turn the readers or listeners from an impartial attitude if they should be chosen for the grave responsibility of jury service. The publicity was of facts and circumstances later presented in the evidence except that of the defendants, which had not been previously revealed.

Every case in respect to a change of venue must be determined on its own state of facts. Jefferson County has a population of around 500,000 and a large reservoir of qualified jurors. This fact differentiates some of our opinions in cases in less populated counties. The evidence presented in these two cases is much like that in Bircham v. Commonwealth, Ky., 238 S. W.2d 1008, which was a homicide in Jefferson County more calculated to inflame the passions of the people than this one. In that opinion and many others we affirmed the decision of the trial court who in his discretion overruled the several motions for changes of venue. Action on a motion for a change of venue is addressed to the sound judicial discretion of the trial judge, and on review it must be shown that it has not been justly and properly exercised under the circumstances. Denial of the motion will not authorize a reversal of a judgment of conviction where it appears from the record as a whole that a fair and impartial trial was given the defendant by the jury chosen. We see no abuse of discretion in overruling the motion for a change of venue in these cases and consequently no error in this particular.

*Continuance.* The indictment was returned March 12, 1952. The next day the defendant was arraigned and the trial set for April 1. Meanwhile, hearings were had on the demurrer to the indictment and on motions for bail and change of venue. On the 22nd, after a motion for severance of the trials of this defendant, Roy Tarrence, and his son, Leonard Tarrence, the Commonwealth elected to try Roy Tarrence first. On the day of the arraignment of the two men, the court had appointed Mr. Sandy Paniello and Mr. Manny Frockte as attorneys to represent Leonard Tarrence, and two other attorneys were appointed for Roy Tarrence. A few days later Roy Tarrence indicated to the court that he desired the attorneys appointed for his son to represent him also and the other lawyers withdrew on March 20. Thus, it appears that the appellant was represented about a week after arraignment by the other attorneys, and thereafter by Paniello and Frockte.

But from the beginning Paniello had been actively participating in the proceedings in behalf of both father and son. During the 19 days between the day of arraignment and the day set for trial the attorneys had been engaged in preparing for argument of the demurrer and the hearing on the motion for change of venue. Only nine days intervened between the ruling and the beginning of the trial.

Some incidental grounds upon which the motion for a continuance rested in part passed out of the case. The only point is that of insufficient time for preparation. A review of the many cases is not necessary. They are of value as precedents in the application of the fundamental rule, universally recognized, that an accused person and his attorney should have full opportunity to prepare adequately for the trial. And we have observed in this connection that busy lawyers who contribute their services without compensation under appointment of the court are often entitled to greater consideration. Davis v. Commonwealth, 310 Ky. 360, 220 S.W.2d 844. In the present case, Mr. Paniello displayed unusual diligence and performed much hard work. He was fully occupied, under pressure, with the responsibility assigned to him. There is no indication in the affidavit supporting the motion that any other testimony in the defendant's behalf might be available, and there is nothing in the record showing that the defendant was deprived of testimony of any material witness, or that the attorney could have done anything more than he did or have made a better defense had further time been granted. The case is unlike Johnston v. Commonwealth, 276 Ky. 615, 124 S.W.2d 1035, where we laid down the rule that if during the course of the trial the denial of a continuance appears to have been unjust or to have had prejudicial results, the error ought to be corrected by granting a new trial. It does not appear that any prejudicial error was committed in this respect. See Penman v. Commonwealth, 141 Ky. 660, 133 S.W. 540; Harris v. Commonwealth, 214 Ky. 787, 283 S.W. 1063; Carter v. Commonwealth, 258 Ky. 807, 81 S.W.2d 883.

*Challenge to the jury panel.* The argument of error in overruling the defendant's challenge to the jury array or panel is directed toward several claimed deviations from statutory requirements. The argument rests upon what seems to be a misunderstanding of the facts; at least there are conflicting variations.

The regular panel of jurors in the second division of the criminal branch of the court having been exhausted through challenges, the panel which had been summoned for the first division was brought into service. A special panel had been drawn from the jury wheel and summoned. The challenge of the special panel rests upon the charge made in an affidavit that the judge in drawing the names from the drum or wheel had deviated from the meticulous directions of the statute. KRS 29.080, 29.-130, 29.140, 29.180. We have held that a substantial deviation from the procedural steps is prejudicial error. Williams v. Commonwealth, 254 Ky. 277, 71 S.W.2d 626; Kitchen v. Commonwealth, 275 Ky. 564, 122 S.W.2d 121; Bain v. Commonwealth, 283 Ky. 18, 140 S.W.2d 612. In those cases there was no contrariety in the evidence of a departure from the prescribed procedure. In the case at bar the trial court put into the record his statement to the effect that he had selected the jurors according to the statutory directions. We have held that a defendant was not prejudiced by the fact that the judge, in the process of drawing names from the wheel, permitted a deputy clerk to take down the names so long as they were not otherwise divulged. Central Kentucky Asylum for Insane v. Hauns, 50 S.W. 978, 21 Ky.Law Rep. 22. So much more is this true in the Jefferson Circuit Court where the present statute places the duty upon a clerk or official stenographer under direction of the court to prepare a record of the drawing of the jury panels with a provision for secrecy. KRS 29.130(3), 29.140(2)(b). Be that as it may, the statement of the trial judge supported by the presumption of regularity must be accepted as revealing the facts. Hopkins v. Commonwealth, 279 Ky. 370, 130 S.W.2d 764. The provision of the stat-

ute requiring the list be put in a sealed envelope does not apply to a specially drawn panel.

■■■■ Another point raised is that in selecting the names to fill the jury box for examination, the clerk did not do so by lot in the manner prescribed by KRS 29.250, 29.260, but called the names at his pleasure. The testimony of the deputy clerk is that the names on the regular panels were drawn from "a sliding drawer" by lot. But the special panel, except those excused, was listed on four sheets of paper, apparently by the sheriff, and the names were not drawn from a container by lot. The order in which the persons were called to the jury box is not the same order in which the panel had been drawn from the wheel. It thus appears that in some way there was a random selection. On the same question it was held in Robertson v. Commonwealth, 269 Ky. 317, 107 S.W.2d 292, that the provision in Sec. 2265, Ky.Stats. (now KRS 29.250) requiring the selection to be made from a "suitable box with a sliding lid" related to a regular panel and did not apply to Sec. 2247, Ky.Stats., now KRS 29.280, which covers the selection of a special venire whether it be drawing from the wheel or summoning bystanders. It is suggested as a reason for this different procedure that "in many cases a large number of names are drawn from the wheel and if the court should be required to wait until all had been summoned and had appeared before proceeding with the trial, unnecessary delay would result." We, therefore, find no error in overruling the challenge to the panel.

■■■■ *Exclusion of women jurors.* During the voir dire examination the court advised the several women they were exempt from service, KRS 29.030(1)(m), and all claimed exemption. The defendant objected and insisted this was not the court's duty. It does seem from the course of the examination that the Commonwealth wanted women excluded because, as it is indicated, of the difficulty in providing facilities for keeping the jury together over night. The appellant argues this advice was prejudicial to his rights, since it saved the Common-

wealth its peremptory challenges, for exemption is not a cause for challenge. Sec. 211, Criminal Code of Practice.

■■■■ The trial judge has a large measure of discretion in exercising his power to examine and to excuse talesmen in a criminal case. We have held that it was not error for the court of its own accord to excuse from a group of five accepted by both sides two men who requested it on account of their age. Webb v. Commonwealth, 223 Ky. 424, 3 S.W.2d 1080. In Fall v. United States, 60 App.D.C. 124, 49 F.2d 506, certiorari denied, 283 U.S. 867; 51 S.Ct. 657, 75 L.Ed. 1471, after the jury had been selected, but before being sworn, the court informed the jurors that they would be locked up during the continuance of the trial and if any of the ladies desired to be excused, they could inform the court. One was excused. The statutory exemption was like ours. It was held there was no error. We think it proper for the court to advise persons exempt from jury service of their right to be excused if they desire.

■■■■ *Challenges for cause.* Appellant submits that certain prospective jurors were improperly excused for having "such conscientious opinions as would preclude him from finding the defendant guilty." Sec. 210, subsec. 7, Criminal Code of Practice. Many were excused on this ground. The appellant points out that a number answered the interrogation in terms not direct or specific. We have carefully considered every one of them, and think their responses leave little doubt that the conscientious attitude of the men and women was such as would have influenced their consideration of the evidence or in arriving at a verdict of death in any case. We find no error in these rulings nor in those on other challenges for cause.

■■■■ The court has a broad discretion in determining the qualification of a juror from his entire examination. Smith v. Commonwealth, 100 Ky. 133, 37 S.W. 586; Williams v. Commonwealth, 254 Ky. 647, 72 S.W.2d 31; Farmers' National Bank of Somerset v. Tartar, 256 Ky. 70, 75 S.W.2d

758; Howard v. Commonwealth, 282 Ky. 663, 139 S.W.2d 742; Watts v. Commonwealth, 308 Ky. 197, 213 S.W.2d 795; 50 C.J.S., Juries, §§ 245(b), 278(c). We do not regard the court as unfair in not allowing the defendant's attorney to question prospective jurors more thoroughly. Quite a liberal examination was permitted.

*Admission of incompetent evidence.* Police officers produced a tire tool such as is used in taking lugs from automobile wheels and a pair of wire cutters found in the defendant's automobile. Defendant objected to their introduction in evidence. There was no blood or other indication that either instrument had been used to kill the decedent. On cross-examination, over objection, the Commonwealth's attorney asked the defendant, and later his son as a witness, whether McCormick was struck with this tire tool. Both stated he was not. Evidence as to the nature and character of the wounds inflicted shows that McCormick was struck several times on the head with a blunt instrument of some kind. No such weapon was found at the scene of the assault in the alley or near the place where the body was found. The coroner, Dr. Dwyer, expressed the opinion it was possible for the instrument used to have been a "pipe or tire tool." The body had been tied up with wire and it was a logical conclusion that wire cutters found in the defendant's automobile had been used in the gruesome operation.

It has always been considered competent for the Commonwealth to show that the defendant had in his possession at the time of the killing a weapon which could have caused the death and that it is not necessary to prove that the instruments introduced had in fact been used. See Allen v. Commonwealth, 82 S.W. 589, 26 Ky.Law Rep. 807; Miller v. Commonwealth, 182 Ky. 438, 206 S.W. 630; Edmonds v. Commonwealth, 230 Ky. 725, 20 S.W.2d 745. The cases relied upon by the appellant are distinguishable. In each of them the identity or connection with the use of the instruments introduced was too speculative. In one of the cases, Higgins v. Commonwealth,

142 Ky. 647; 134 S.W. 1135, 1138, the court laid down this rule or guide for the admissibility of such evidence:

"It should also appear from the evidence that it was found at a time and place furnishing reasonable ground to connect it some way with the homicide. The proof need not positively show the connection; but there must be proof rendering the inference reasonable or probable from its nearness in time and place or other circumstances."

We think the introduction of these instruments came within the rule.

*Evidence of threats by the defendant.* Norris Flint, who lived on Harrods Creek near the place where McCormick's body was found, testified the Tarrences were frequently nearby on fishing trips. About three or four weeks before the homicide, the defendant on trial, Roy Tarrence, was at the witness' house and they were talking about how much money it took for a living. Tarrence called the attorney representing Leonard's wife, but without mentioning his name, a son-of-a-bitch, and said he was "trying to get all the money they [sic] could and that someone should knock him in the head and throw him in the creek." The witness was a little reluctant and added that Tarrence never said he was going to do it but that it "ought to be done."

It seems to us the statement was close enough in time and sufficient in reference to be admissible as showing motive and malice. It had particular significance to subsequent events. Puckett v. Commonwealth, 235 Ky. 340, 31 S.W.2d 383; Thomas v. Commonwealth, 257 Ky. 605, 78 S.W.2d 777. The defendant's failure to request an admonition that the purpose of its admission was only to show motive or intent and was not of itself sufficient to establish guilt, waived his right to claim it now. See Holman v. Commonwealth, 291 Ky. 622, 165 S.W.2d 167; Johnson v. Commonwealth, 310 Ky. 557, 221 S.W.2d 87.

*Improper cross-examination.* In the course of vigorous cross-examinations

of the defendant and his son, the Commonwealth's attorney asked a number of questions, the affirmative answers to which would have revealed deliberate preparations for the killing and cruel treatment of the man while being taken to Harrods Creek. But the witnesses answered in the negative. It is claimed the interrogations were unfair as having no foundation in fact and no record as a basis. The line of questioning was based on statements in admissions and confessions of the witnesses which they had denied in their direct examination. An enlargement or development of the details sought would have been res gestae and competent. We regard the examinations as within the proper latitude of fairness and reasonableness.

██ *Admissions of other evidence.* The testimony concerning the finding and raising of the body of the deceased from the water was kept well within the court's admonition to avoid details which might have been of a gruesome nature.

██ Having admitted without objection the widow's testimony concerning the deceased's family, including the fact that a son was in the air corps and confined to a hospital in Texas, the court should perhaps have not observed as having nothing to do with the case the defendant's statement that his son, a soldier, had just returned from Korea to attend the trial. This was of no consequence and certainly not prejudicial error. There is likewise no merit in other contentions of impartiality in admitting evidence.

██ Two rebuttal witnesses stated the first assault was committed by both men and described its violent character. This was in somewhat more detail than the testimony of witnesses originally introduced. The evidence might well have been presented as direct proof but it was also competent in rebuttal. The defendant and his son had testified that the father did not take any part in this assault but had remained in the automobile until he got out and tried to separate McCormick and Leonard Tarrence.

*Instructions.* The instruction defining "wilfully" and "malice aforethought" as used in the preceding instructions included the statement that if the jury believed from the evidence beyond a reasonable doubt that the defendant alone or jointly with his son was at the time of the assault "engaged in the act of committing the felony of false arrest or false imprisonment of the deceased," the "said circumstances constitute malice within the meaning of these instructions." False arrest or false imprisonment was then defined "to be the felonious and forceable detaining of another or preventing free locomotion on his part against his will and without his consent and committed without legal or lawful authority." The appellant contends this was a prejudicial error since there is no testimony in the record to sustain a theory of false arrest.

██ Abduction, in the broad sense of carrying a person away wrongfully, was what the witnesses described and what the jury was or could have been justified in believing had occurred. This is the most aggravated species of false imprisonment. KRS 435.150 makes it a felony for any person to arrest or imprison another otherwise than according to law but under circumstances not constituting kidnapping and holding for ransom, or for any person to cause or in any manner counsel, aid or abet such arrest or imprisonment. Whether this would cover the mere unlawful restraint of the physical liberty of another person is doubtful, but it certainly includes an abduction of this character.

██ Incorporating in an instruction that the perpetration or attempted perpetration of another crime constitutes malice is unusual. Although the accused may not have had the intention of taking a life, malice in respect to such homicide may be implied or inferred on the ground that the killing was done while the person who did the act was engaged in the commission of some other felony or in an attempt to perpetrate some offense of that grade. "The turpitude of the act contemplated is by implication of law transferred to the homicide

which actually is committed so as to make the latter offense a killing with malice, contrary to the real fact of the case as it appears in evidence." 26 Am.Jur., Homicide, Secs. 188, 309. It makes no difference that another participant used the weapon with which the killing was done. All are equally guilty. Marion v. Commonwealth, 269 Ky. 729, 108 S.W.2d 721; Whitfield v. Commonwealth, 278 Ky. 111, 128 S.W.2d 208; Simpson v. Commonwealth, 293 Ky. 831, 170 S.W.2d 869. An instruction defining the law applicable to such a statement of facts may be given and such instruction may properly define and explain the other offense involved. 41 C.J.S., Homicide, § 361. However, in this jurisdiction the usual form is an instruction that if the accused committed or attempted to commit another felony and in doing so killed a person, the jury should find him guilty of murder. Instructions to Juries, Stanley, Sec. 870. Therefore, the unusual instruction was more favorable to the defendant than one the law authorized.

The omission of instructions on voluntary and involuntary manslaughter is a claimed error. As we have stated, Leonard Tarrence's testimony is that he approached McCormick in a friendly attitude, but when he responded with the threat to send him to the penitentiary or to Korea (it being the policy of the Army to send soldiers who had been AWOL immediately into active service), he, Leonard, struck McCormick with his fist and knocked him 5 or 6 feet away and then picked up a stick and hit him 3 or 4 times across the head. It was then that the father came into the affray and they put the man into the automobile.

■■■ No matter how violent the slayer's passion may have been, it will not relieve him of the implication of murder unless it was engendered by the degree or character of provocation to kill as would have naturally overcome and suspended the self-control of a man of fair, ordinary and average disposition or will power or cause such a one to act rashly or without due deliberation or reflection. McHargue v. Commonwealth, 231 Ky. 82, 21 S.W.2d 115,

This finds expression in the traditional instruction on voluntary manslaughter. Instructions to Juries, Stanley, Secs. 868, 869. The adequacy or reasonableness of the provocation to reduce a homicide to voluntary manslaughter is usually for the jury to determine but whether certain undisputed facts constitute legal provocation is a matter of law for the judge to determine. Roberson's Ky.Crim.Law, Sec. 375; Helm v. Commonwealth, 156 Ky. 751, 162 S.W. 94; McHargue v. Commonwealth, supra. This provocation must not be merely slight in character but must be substantial in nature. While extreme harsh, abusive or grossly insulting language by the deceased may constitute lawful provocation, yet it has been held in a number of cases that mere words of reproach or gestures, though insulting, or threats when unaccompanied by assault, are not adequate to reduce murder to manslaughter. Roberson's Ky.Crim.Law, Secs. 374, 375, 382. We do not regard the statement attributed to McCormick by Leonard Tarrence as evidence of substantial provocation. Cox v. Commonwealth, 69 S.W. 799, 24 Ky. Law Rep. 680; Helm v. Commonwealth, 156 Ky. 751, 162 S.W. 94; Cooksey v. Commonwealth, 235 Ky. 454, 31 S.W.2d 703.

■■■ The appellant, Roy Tarrence's right in this respect was no greater than his son's right, for where one interferes and espouses the quarrel of another, he stands in place of the other and is as guilty of the crime as the person who actually committed it. Roberson's Ky.Crim.Law, Sec. 343; Crockett v. Commonwealth, 100 Ky. 382, 38 S.W. 674, 18 Ky.L.R. 838; McHargue v. Commonwealth, 231 Ky. 82, 21 S.W.2d 115; Hurd v. Commonwealth, 257 Ky. 315, 78 S.W.2d 9.

■■■ If this were not a death penalty case, we would have no hesitancy in saying there was no evidence of provocation, but since this is a death case, we could well resolve any doubt on the question in favor of the defendant. But even so, since the jury gave the extreme penalty for murder rather than the lesser penalty of life imprisonment, it is readily

apparent that he was not prejudiced by the omission of the voluntary manslaughter instruction. Cravens v. Commonwealth, Ky., 262 S.W.2d 466. There was nothing to base an involuntary manslaughter instruction on.

 *Improper argument.* In the closing argument the Assistant Commonwealth's attorney, Mr. Ousley, made several improper statements and appeals to the emotions of the jury. His inconsiderate zeal led him astray. However, in the circumstances of the case, it is inconceivable that any of the statements affected the verdict. They must, therefore, be regarded as not prejudicial.

*Coercion of verdict and misconduct of deputy sheriff.* The case was given to the jury at 10:45 P.M. April 2, 1952, and the verdict was returned that night at 4:35 A.M. During the night a deputy sheriff on guard several times asked the jury, under direction of the court, whether they preferred to continue their deliberations or go to a hotel for the night. They preferred to remain. We gather from the meager statements in the bill of exceptions and the court's opinion in overruling the motion for a new trial that the deputy sheriff did not enter the room but spoke to the jury at the open door and in the presence of the court. The emphasis of the appellant's brief is really on the overruling of a motion to have the official stenographer report these conversations. We see nothing improper in these proceedings.

However, it strikes us that where a jury has gone through an all-day trial, keeping or permitting them to continue their deliberations practically all night without interruption might result in an unjust verdict from tired minds. But it is manifest from the record that this was the express preference of the jury and there was no objection.

*Conclusion.* From the beginning to the end, the police, the prosecuting officers and the trial court treated the accused father and son justly and fairly and jealously regarded their constitutional rights. They have been condemned to die by juries of their peers under the sanction of a sublime law that has come down through the ages. Perhaps their story that there was no premeditation and no deliberate intention to kill Mr. McCormick is true. Yet, the events of the moment constituted murder within the law. Our responsibility has been to review the record to see if the defendant received a fair trial as measured by the law and the rules of procedure which have been established through many years of experience as conducive to impartial justice. We have met the grave responsibility and found the record to be free of any error of materiality.

The judgment is affirmed.